# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | | |
|---|---|---|
| BREAKING FREE, LLC, and CONNIE BUTTRAM, | } } } | |
| Plaintiffs, | } } | |
| v. | } } | Case No.: 4:18-cv-01659-ACA |
| JCG FOODS OF ALABAMA, LLC, KOCH MEAT CO., INC., and KOCH FOODS, INC., | } } } } | |
| Defendants. | } } | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Connie Buttram owns Plaintiff Breaking Free, LLC ("Breaking Free"). Plaintiffs are contract poultry growers for Defendants JCG Foods of Alabama, LLC ("JCG"), Koch Meat Co., Inc., and Koch Foods, Inc. (collectively "Koch"). Plaintiffs allege that Defendants prevented them from growing chickens in a fair and profitable manner. Plaintiffs filed this lawsuit, asserting federal claims against Defendants for violations of the Packers and Stockyards Act ("PSA") and the Agricultural Fair Practices Act ("AFPA"). Plaintiffs also assert claims under Alabama state law for fraud, breach of contract, breach of the

covenant of good faith and fair dealing, and negligent, willful, and reckless misrepresentation.

This case is before the court on Defendants' motions to dismiss. (Doc. 11; Doc. 25). Defendants seek dismissal of Plaintiffs' PSA claim and their state law claims for fraud, breach of the covenant of good faith and fair dealing, and negligent, willful, and reckless misrepresentation. Defendants also ask the court to dismiss Plaintiffs' request for consequential and punitive damages.[1]

For the reasons explained below, the court **GRANTS IN PART** and **DENIES IN PART** the motions to dismiss.

## I.    BACKGROUND

At this stage, the court must accept as true the factual allegations in the complaint and construe them in the light most favorable to the plaintiff. *Butler v. Sheriff of Palm Beach Cty.*, 685 F.3d 1261, 1265 (11th Cir. 2012). The court also may consider documents attached to a motion to dismiss if it is central to the plaintiff's claims and the authenticity of the document is not challenged. *Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005). Defendants attach to their motions to dismiss a copy of one of Plaintiffs' contracts with JCG Foods and a letter from Defendants' counsel to Plaintiffs' counsel. (Doc. 11-1; Doc. 11-2; Doc. 25-1; Doc. 25-2). The documents are central to Plaintiffs' claim, and Plaintiffs have not

---

[1] Defendants have not moved to dismiss Plaintiffs claim for violations of the AFPA or their claim for breach of contract. Those claims will proceed.

challenged their authenticity. Therefore, the court's description of the facts incorporates Plaintiffs' allegations and the content of the documents attached to Defendants' motions to dismiss.

Defendants operate a poultry processing plant in Collinsville, Alabama. (Doc. 1 at ¶ 12). Defendants utilize poultry growing arrangements where poultry farmers or independent contractors known as growers care for poultry pursuant to instructions provided by Defendants. (Doc. 1 at ¶ 12).

Plaintiffs operate a poultry growing farm in DeKalb County, Alabama. (Doc. 1 at ¶¶ 1-2, 13). Ms. Buttram's husband, Jonathan Buttram, lives on the farm with her. (Doc. 1 at ¶ 13). Ms. Buttram and Mr. Buttram are members of the Alabama Contract Poultry Growers Association ("ALCPGA"), and both have served as officers of the organization. (Doc. 1 at ¶ 13).

In late 2005, Koch contacted Ms. Buttram about growing poultry, and Koch personnel stated that upon the company's approval of poultry facilities, Koch "would place birds in the facilities and would enter into a poultry growing arrangement with [Ms.] Buttram for the production of broilers." (Doc. 1 at ¶ 15). Koch personnel also promised Ms. Buttram "that as long as she grew a good bird, she would continue to receive baby chicks from Koch." (Doc. 1 at ¶ 15).

Plaintiffs allege that "JCG's and Koch's representations that [Ms.] Buttram would continue to receive chickens was the primary inducement for [Ms.] Buttram

to enter into the agreement with JCG and Koch as well as to expend funds to improve her chicken houses." (Doc. 1 at ¶ 17). Plaintiffs also allege that JCG and Koch "knew that their representations to [Ms.] Buttram that she would continue to receive chickens as long as she grew good birds were false and were intended to induce [Ms.] Buttram to improve her facilities on at least five (5) different occasions at her expense and to continue to contract with JCG and Koch." (Doc. 1 at ¶ 18).

It is unclear from the complaint what the relationship is between JCG and Koch. It is also unclear from the complaint when Plaintiffs first contracted with Defendants or how many total contracts were signed, but the complaint refers to two specific agreements. Plaintiffs entered a contract with JCG titled Broiler Production Agreement ("BPA"). (Doc. 1 at ¶ 11). The complaint does not state when the BPA was executed or how long it was in effect. According to Plaintiffs, pursuant to the terms of BPA,

> JCG and Koch supply the chicks, feed, medicine, and other necessary supplies to the growers (Plaintiffs). The growers care for the chicks for approximately 5 to 6 weeks. Growers own their farms, chicken houses and equipment, and provide labor, materials, and utilities necessary to care for the chicks. The chicken houses and equipment must originally meet JCG's and Koch's strict requirements dealing with design plans and specifications subject to JCG's and Koch's sole approval before a grower is accepted by JCG and Koch. JCG and Koch also dictate the type of veterinary care provided to the birds throughout their lives and the birds' condition of confinement.

(Doc. 1 at ¶ 11).

4

The second agreement specifically mentioned in the complaint is a Poultry Production Agreement ("PPA") that Plaintiffs and JCG executed on October 9, 2015. (Doc. 1 at ¶ 20; *see* Doc. 11-1). Pursuant to the terms of the PPA, JCG delivers to Plaintiffs chickens along with feed, medication, other supplies, and technical instruction. (Doc. 11-1 at 5). In exchange, Plaintiffs grow and care for the chickens consistent with guidelines provided by JCG. (Doc. 11-1 at 5). The PPA gives JCG sole discretion to determine the number, type, and size of chickens placed on Plaintiffs' farm; the time for processing chickens; and the date, time, and interval of placement of future chickens. (Doc. 11-1 at 6). The PPA prohibits Plaintiffs or its employees from owning, maintaining, or caring for other poultry or birds, including "domestic poultry, fowl, turkey, ostrich, emu, rhea, or guinea" on their farm. (Doc. 11-1 at 8). JCG pays Plaintiffs based on a specific formula that incorporates a number of criteria determined by JCG. (Doc. 11-1 at 9-10, 22-23). The PPA also contains a clause regarding limitation of damages. (Doc. 11-1 at 16).

During the week of November 9, 2016, JCG picked up a flock of broilers from Ms. Buttram's farm for processing, and consistent with the terms of the PPA, Ms. Buttram began preparing her poultry houses for the next flock of birds. (Doc. 1 at ¶ 22). JCG and Koch personnel told her to expect new chicks on her farm within a few days. (Doc. 1 at ¶ 22). Ms. Buttram relied on these representations,

and during the week of November 14, 2016, she continued preparing her poultry houses for the next flock of chicks. (Doc. 1 at ¶¶ 23, 27-28). By the following week, JCG and Koch had sprayed the poultry houses for insect and rodent control. (Doc. 1 at ¶ 28).

On November 23, 2016, JCG and Koch representative Mike Hales called Ms. Buttram and summoned her to meet with JCG representatives to discuss Ms. Buttram's husband. (Doc. 1 at ¶ 29). Specifically, JCG representatives wanted information regarding Mr. Buttram's involvement with a restaurant in Ohio and the restaurant's role in assisting with a documentary called "Super Size Me 2: Holy Chicken!". (Doc. 1 at ¶¶ 29, 34). The meeting was to take place on November 28, 2016. (Doc. 1 at ¶ 26).

On the morning on November 28, 2016, Ms. Buttram called JCG's and Koch's office to ask why her feed had not been delivered and when she could expect her next placement of birds. (Doc. 1 at ¶ 30). Mr. Hales told Ms. Buttram that she needed to come to his office to discuss her husband's activities. (Doc. 1 at ¶ 30). Because feed is generally delivered about a week before birds arrive, Ms. Buttram was concerned that JCG and Koch would not deliver birds until after the meeting. (Doc. 1 at ¶ 30). Mr. Hales assured Ms. Buttram that she would receive birds on December 2, 2016. (Doc. 1 at ¶ 30).

Later on November 28, 2016, Ms. Buttram called Mr. Hales again and told him that she needed to postpone the meeting. (Doc. 1 at ¶ 31). When Ms. Buttram told Mr. Hales that she could not meet on November 28, 2016, Mr. Hales informed her that she would not receive additional birds until the meeting took place. (Doc. 1 at ¶¶ 24, 32). Since then, JCG and Koch have continued to deny placement of chicks on Ms. Buttram's farm. (Doc. 1 at ¶ 32). JCG and Koch also have refused to allow the Buttram's children to grow chickens for them. (Doc. 1 at ¶ 33).

On February 23, 2017, counsel for JCG sent a letter to Plaintiffs' counsel. (Doc. 26; *see* Doc. 11-2). The letter states, in pertinent part:

> In late November, JCG Foods requested a meeting with Connie Buttram to discuss important issues under her Poultry Production Agreement relating to significant biosecurity concerns that arose relating to poultry growing activities in which [JCG] learned Jonathan Buttram was engaged. Specifically, [JCG] learned that Mr. Buttram was engaged in growing free-range poultry while also assisting with the operations of Ms. Buttram's farm, Breaking Free Farm.

> As you are likely aware, biosecurity and the prevention of bird disease, such as Avian Influenza, is an extremely important issue in the poultry industry. An outbreak of Avian Influenza at a farm growing chickens for [JCG] could be devastating to [JCG] and the industry. As a result of the risks associated with the possible spread of contagious disease, Ms. Buttram, just as all independent contractor producers under contract with [JCG], is required under her agreement to comply with [JCG's] biosecurity requirements and is prohibited from raising any other flocks, poultry or birds on the farm or on any other premises. This prohibition includes anyone providing services on Ms. Buttram's behalf. [JCG's] understanding is that Mr. Buttram carries out day-to-day operational activities at the Breaking Free Farm.

The biosecurity risk associated with raising free-range poultry is particularly significant because of the potential exposure to wild birds, rodents, and animals through which transmission of infectious diseases may take place. For these reasons, when the Company learned that Mr. Buttram was involved with other poultry growing operations, it reached out to Ms. Buttram as the contracting party so that [JCG] could promptly and cooperatively assess the risks associated with Mr. Buttram's activities and determine how to proceed. Meeting with producers about issues of significant concern involving the operation of their farms is not unusual and is certainly not unique to Ms. Buttram.

. . .

[JCG] is acting in the best interests of both [Ms. Buttram] and [JCG] in addressing the important biosecurity concerns raised by Mr. Buttram's other poultry growing activities. Once [JCG] understands the extent of Mr. Buttram's involvement with growing other poultry and his current role with the operation of the Breaking Free Farm, [JCG] and Ms. Buttram can determine how to proceed with the goal of resuming flock placements at the farm promptly.

If Ms. Buttram wishes to address the biosecurity concerns of [JCG] and receive additional flocks, please let me know when she might be available to meet with [JCG]. . . .

(Doc. 11-2 at 2-3).

Plaintiffs allege that prior to February 23, 2017, Defendants never discussed a potential bio-security threat. (Doc. 1 at ¶ 25). According to Plaintiffs, JCG's counsel's representation regarding a potential bio-security problem at Ms. Buttram's farm was "conjured and false" and "intended to intimidate [Ms.] Buttram into complying" with Defendants' demands that she meet to discuss her husband's activities. (Doc. 1 at ¶ 26).

## II.    DISCUSSION

Defendants move to dismiss Plaintiffs' complaint on both procedural and substantive grounds.    Procedurally, Defendants ask the court to dismiss the complaint in its entirety because it is an improper shotgun pleading.    (Doc. 12 at 21-22; Doc. 26 at 21-22).    Substantively, Defendants seek to dismiss certain claims for failure to state a claim.    (Doc. 12 at 8-21, 23-25; Doc. 26 at 8-21, 23-25).    The court addresses each argument in turn.

### A.    Shotgun Pleading

The court may dismiss a shotgun pleading that violates either Rule 8(a)(2) or Rule 10(b) of the  Federal Rules of Civil Procedure.  *Weiland v. Palm Beach Cty. Sheriff's Office*, 792 F.3d 1313, 1320 (11th Cir. 2015).  Defendants argue that the complaint is an impermissible shotgun pleading because the complaint does not distinguish between the actions taken by the different Defendants.  (Doc. 12 at 21-22; Doc. 26 at 21-22).  Therefore, Defendants contend that "they are left to divine the nature of and facts supporting Plaintiffs' claims."  (Doc. 12 at 22; Doc. 26 at 22).  Plaintiffs respond that their "factual allegations jointly and severally concern each named Defendant."  (Doc. 21 at 22; Doc. 32 at 21).

The court should dismiss a shotgun complaint if it fails "to give the defendants adequate notice of the claims against them and the grounds up on which each claim rests."  *Weiland*, 792 F.3d at 1323.  That is not the case here.  In fact,

all three Defendants submitted thorough responses to the complaint by way of their motions to dismiss which indicates that the Defendants had no trouble understanding the nature of Plaintiffs' claims and the factual allegations supporting those claims. Therefore, the court will not dismiss Plaintiffs' complaint as an impermissible shotgun pleading.

### B.    Merits

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendants move to dismiss Plaintiffs' PSA, fraud, breach of the covenant of good faith and fair dealing, and negligent, willful, and reckless misrepresentation claims for failure to state a claim. (Doc. 12 at 8-21; Doc. 26 at 8-21). Defendants also ask the court to dismiss or strike Plaintiffs' request for consequential and punitive damages. (Doc. 12 at 23-25; Doc. 26 at 23-25).

Typically, "[a] pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "To survive a motion to dismiss, the plaintiff must plead 'a claim to relief that is plausible on its face.'" *Butler*, 685 F.3d at 1265 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## 1. *Count One (Violations of Packers and Stockyards Act)*

In Count One, Plaintiffs allege Defendants violated Sections 202(a) and (b) of the PSA. (Doc. 1 at ¶¶ 37-39). Under the PSA, it is unlawful for live poultry dealers to "[e]ngage in or use any unfair, unjustly discriminatory, or deceptive practice or device" or "subject any particular person or locality to any undue or unreasonable prejudice or disadvantage in any respect." 7 U.S.C. § 192(a) and (b). Plaintiffs allege that Defendants violated the PSA when they failed to place birds on Plaintiffs' farm in retaliation for Mr. Buttram's activities and Mr. and Ms. Buttram's membership in ALCPGA. (Doc. 1 at ¶ 34). Defendants argue that Plaintiffs' PSA claims fail to state a claim because Plaintiffs have not alleged conduct that adversely affects competition or that is likely to adversely affect competition. (Doc. 12 at 10-16; Doc. 26 at 10-16).

The Eleventh Circuit has held that "to succeed on a claim under the PSA, a plaintiff must show that the defendant's unfair, discriminatory or deceptive practice adversely affects or is likely to adversely affect competition." *London v. Fieldale Farms Corp.*, 410 F.3d 1295, 1303 (11th Cir. 2005). Thus, at the Rule 12(b)(6) stage, to sufficiently state a claim under the PSA, Plaintiffs must allege facts from which the court can plausibly infer that Defendants' acts have or are likely to have an anticompetitive effect.

In their complaint, Plaintiffs allege that Koch controls 7.4% of the nationwide contract poultry market. (Doc. 1 at ¶ 4). Plaintiffs allege that Ms. Buttram has grown chicks for Defendants since at least 2005. (Doc. 1 at ¶ 15). Ms. Buttram and her husband have been active members and officers of ALCPGA, a statewide agricultural cooperative association "dedicated to promoting the common interest and general welfare of producers of agricultural products." (Doc. 1 at ¶ 14). And Mr. Buttram has a relationship with a restaurant that was involved in the making of a documentary that might reflect poorly on Defendants. (Doc. 1 at ¶¶ 19, 34).

Plaintiffs allege that in retaliation for the Buttrams' work with ALCPGA and for Ms. Buttram's failure to meet with Defendants' executives to discuss her husband's "escalating work to educate the public about abuses in the poultry industry and the poultry marketplace," Defendants breached the PPA and stopped placing chicks on Plaintiffs' farm, despite Ms. Buttram's satisfactory performance under the terms of her contract. (Doc. 1 at ¶¶ 19, 31). Plaintiffs also allege that Defendants falsely claimed that Mr. Buttram's activities created a bio-security problem at Plaintiffs' farm, and this claim was "intended to intimidate [Ms. Buttram] into complying with their demands that she must become their informant as it relates to her husband's activities." (Doc. 1 at ¶ 26). In addition, Plaintiffs

allege that Defendants have refused to allow the Buttrams' children to grow chickens for them. (Doc. 1 at ¶ 33).

Although tenuous, at the pleading stage, the court can infer from these allegations that Defendants' acts are likely to harm competition. Plaintiffs expressly allege that Defendants have prohibited other potential growers (the Buttram children) from entering the contract chicken growing business. And the court can reasonably infer that Defendants' practices with Plaintiffs would discourage other growers from entering poultry growing contracts. Accordingly, the court **DENIES** Defendants' motion to dismiss Plaintiffs' PSA claims.[2]

### 2.     *Count Three (Fraud)*

In Count Three, Plaintiffs allege that Defendants fraudulently misrepresented that "as long as [Ms. Buttram] grew good birds, she would continue to receive placements of baby chicks from JCG and Koch." (Doc. 1 at ¶ 48). Under Alabama law, to state a claim for fraudulent misrepresentation, a plaintiff must allege facts showing "(1) a false representation; (2) that the false representation concerned a material existing fact; (3) that the plaintiff relied upon the false representation; and (4) that the plaintiff was damaged as a proximate result of the reliance." *Billy Barnes Enterprises, Inc. v. Williams*, 982 So. 2d 494,

---

[2] Because the court finds that Plaintiffs have adequately pleaded that Defendants' actions are likely to have an anticompetitive effect, the court does not address at this juncture Plaintiffs' alternative arguments that their PSA claims may survive a motion to dismiss without an allegation of anticompetitive conduct. (*See* Doc. 21 at 12-18; Doc. 32 at 10-18).

499 (Ala. 2007) (internal quotation marks and citation omitted). Defendants contend that Plaintiffs' fraud claim fails because an alleged failure to perform a contract cannot state a claim for fraud independent from Plaintiffs' breach of contract claim and because Plaintiffs failed to plead their fraud claim with the specificity required under Federal Rule of Civil Procedure 9(b). (Doc. 12 at 16-18; Doc. 26 at 16-18).

Under Alabama law, "[a] mere failure to perform a contract obligation is not a tort" and will not support a fraud claim. *C & C Products, Inc. v. Premier Indus. Corp.*, 275 So. 2d 124, 130, 290 Ala. 179, 186 (Ala. 1972). However, when a defendant fraudulently induces a plaintiff into making a contract and "misrepresents facts related to its intention or ability to perform under a contract, 'a single transaction can support an award of damages for both breach of contract and fraud.'" *Combined Servs., Inc. v. Lynn Elecs. Corp.*, 888 F.2d 106, 107 (11th Cir. 1989) (quoting *Deupree v. Butner*, 522 So. 2d 242, 244 (Ala. 1988)); *Dickinson v. Land Developers Const. Co., Inc.*, 882 So. 2d 291, 304 (Ala. 2003) (J. Houston, concurring specially) ("[T]o assert a fraud claim that stems from the same general facts as one's breach-of-contract claim, the fraud claim must be based on representations independent from the promises in the contract and must independently satisfy the elements of fraud.") (citing *Deupree*, 522 So. 2d at 245 (Ala. 1988)).

In their complaint, Plaintiffs allege that Defendants' "representations that [Ms. Buttram] would continue to receive chickens was the primary inducement for [Ms.] Buttram and Breaking Free to enter into the agreement with JCG and Koch as well as expend funds to improve her chicken houses." (Doc. 1 at ¶¶ 17, 49). Plaintiffs also allege that Defendants knew that these representations "were false and intended to induce [Ms. Buttram] to improve her facilities on at least five (5) different occasions at her expense and to continue to contract with JCG and Koch." (Doc. 1 at ¶¶ 18, 50). Plaintiffs allege that they reasonably relied on the representations and have suffered damages as a result. (Doc. 1 at ¶¶ 53, 56-57). Therefore, to the extent Plaintiffs' fraud claim is based on these allegations, at the pleading stage, the claim survives Defendants' initial challenge because the Plaintiffs have alleged misrepresentations of fact regarding Defendants' intentions to perform its obligations under the contract separate from the promises in the contract itself. However, the general nature of Plaintiffs' fraud allegations do not meet Rule 9(b)'s heightened pleading requirement.

"In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). In the Eleventh Circuit, a plaintiff satisfies this requirement if the complaint sets forth:

> (1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of

such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud.

*Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001) (quoting

*Brooks v. Blue Cross and Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1371 (11th Cir.

1997)). "[I]t is sufficient to plead the who, what, when, where, and how of the

allegedly false statements and then allege generally that those statements were

made with the requisite intent." *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230,

1237 (11th Cir. 2008).

Plaintiffs' complaint does not allege the time and place of each allegedly

false statement or the person responsible for making the statement (i.e. the who,

when, and where of the purportedly false statements). (*See* Doc. 1 at ¶¶ 17-18; 49-

50). Therefore, the court **GRANTS** Defendants' motion to dismiss Plaintiffs'

fraud claim and **DISMISSES** Count Three **WITHOUT PREJUDICE**.

> ### *3. Count Five (Breach of Implied Covenant of Good Faith and Fair Dealing)*

In Count Five, Plaintiffs allege that Defendants violated an implied covenant

of good faith and fair dealing contained in Plaintiffs' contract with JGC Foods.

(Doc. 1 at 18-19). Defendants argue that the court should dismiss Plaintiffs' good

faith and fair dealing claim because Alabama law does not recognize a cause of

action for breach of implied covenants of good faith and fair dealing outside of

consumer insurance contracts. (Doc. 12 at 19; Doc. 26 at 19-20). Plaintiffs offer no response to Defendants' argument. (*See generally* Doc. 21; Doc. 32).

"Although every contract contains either an express or an implied covenant that the parties will act in good faith in performing the contract, in Alabama only insurance contracts give rise to a duty imposed by law on which a tort claim for bad faith performance can be based." *Grant v. Butler*, 590 So. 2d 254, 256 (Ala. 1991) (finding that trial court properly dismissed good faith and fair dealing claim based on employment contract); *see e.g., Buckentin v. SunTrust Mortg. Corp.*, 928 F. Supp. 2d 1273, 1287 (N.D. Ala. 2013) (plaintiff's breach of implied covenant of good faith fair dealing claim based on mortgage contract failed as matter of law).

The contract in this case is not an insurance contract. Accordingly, the court **GRANTS** Defendants' motions to dismiss Plaintiffs' good faith and fair dealing claim. The court **DISMISSES** Count Five **WITH PREJUDICE**.

### *4. Count Six (Negligent, Willful, and Reckless Misrepresentation)*

In Count Six, Plaintiffs allege negligent, willful, and reckless misrepresentation. (Doc. 1 at 19-20). Specifically, Plaintiffs claim that "JCG's and Koch's representations regarding Plaintiffs' so-called bio-security problems performance were negligently, willfully and recklessly prepared and presented and were material and intended to show that the Plaintiffs' bio-security problem was a true, correct, and fair analysis." (Doc. 1 at ¶ 69).

Under Alabama law, "[t]he elements of a misrepresentation claim are 1) a misrepresentation of material fact, 2) made willfully to deceive, recklessly, without knowledge, or mistakenly, 3) which was reasonably relied on by the plaintiff under the circumstances, and 4) which caused damage as a proximate consequence." *Bryant Bank v. Talmage Kirkland & Co., Inc.*, 155 So. 3d 231, 238 (Ala. 2014). Defendants argue that Plaintiffs' complaint does not state a misrepresentation claim because there is no allegation in the complaint that Defendants made a false representation that Plaintiffs relied on to their detriment.

The basis of Plaintiffs' misrepresentation claim is Defendants' alleged misrepresentation regarding the bio-security risk that Plaintiffs' farm posed. (Doc. 1 at ¶ 69). Plaintiffs argue that they sufficiently pleaded reasonable reliance on this misrepresentation because on November 9, 2016, Defendants told Plaintiffs that birds would be placed on their farm after meeting to discuss Mr. Buttram's activities, and beginning on November 14, 2016, in reliance on those statements, Plaintiffs continued to prepare their poultry houses to receive birds. (Doc. 21 at 21-22; Doc. 32 at 20-21) (citing Doc. 1 at ¶¶ 22, 24). However, by Plaintiffs' own pleading, Defendants first made statements regarding potential bio-security concerns in February 2017 when Defendants' counsel sent Plaintiffs' counsel a letter. (Doc. 1 at ¶¶ 25-26; *see also* Doc. 11-2). Therefore, any actions Plaintiffs took in November 2016 could not have been in reasonable reliance on statements

that were not made until February 2017, and Plaintiffs have not sufficiently stated a claim for negligent, willful, and reckless misrepresentation.

Accordingly, the court **GRANTS** Defendants' motion to dismiss Plaintiffs' negligent, willful, and reckless misrepresentation claim and **DISMISSES** Count Six **WITHOUT PREJUDICE**.

### *5.* *Consequential and Punitive Damages*

In their complaint, Plaintiffs request punitive damages and incidental and consequential damages for lost business opportunities, loss of reputation, and mental and emotional anguish. (Doc. 1 at ¶¶ 40, 46, 57, 58, 62, 66, 70-71). The PPA contains a clause limiting damages. (Doc. 11-1 at 16). The clause states, in relevant part, that JCG "will not be liable to [Plaintiffs] for, and [Plaintiffs] as a part of the bargain of this Agreement, waive[] claims against [JCG] for punitive, incidental and consequential damages, including claims for lost profits or revenue or exemplary damages." (Doc. 11-1 at 16). Based on this contractual provision, Defendants ask the court to dismiss or strike Plaintiffs' request for incidental, consequential, and punitive damages.

Alabama courts enforce contractual provisions that restrict recovery of certain types of damages, as long as the provisions are not unconscionable and do not violate public policy. *Sears Termite & Pest Control, Inc. v. Robinson*, 883 So.2d 153, 156-158 (Ala. 2003). The test for determining whether a contract is

unconscionable has two elements: "(1) terms that are grossly favorable to a party that has (3) overwhelming bargaining power." *Am. Gen. Fin., Inc. v. Branch*, 793 So. 2d 738, 748 (Ala. 2000); *see also Layne v. Garner*, 612 So. 2d 404, 408 (Ala. 1992) ("An unconscionable contract or contractual provision is defined as a contract or provision such as no man in his sense and not under delusion would make on the one hand, and as no honest and fair man would accept on the other.") (internal quotation marks and citation omitted).

Plaintiffs submit that the contractual limitation on damages is unconscionable. (Doc. 21 at 24-27; Doc. 32 at 23-25). Defendants respond that "without evidence or support," this "blanket accusation of unconscionability cannot invalidate a contract that was freely bargained for." (Doc. 27 at 18; *see* Doc. 41 at 17). At the pleading stage, Plaintiffs need not submit evidence in support of this contention, and the court finds that Plaintiffs have sufficiently raised the issue of unconscionability. Therefore, the court **DENIES** Defendants' motion to dismiss or strike Plaintiffs' request for consequential, incidental, and punitive damages.

### 6. *Amendment*

In response to Defendants' motion, Plaintiffs request leave to amend their complaint to sufficiently plead their fraud and negligent, willful, and reckless misrepresentation claims should the court determine that the original complaint

fails to do so. (Doc. 21 at 18, 22; Doc. 32 at 20). A response in opposition to a motion is not the appropriate manner to seek leave to amend. *Rosenberg v. Gould*, 554 F.3d 962, 967 (11th Cir. 2009) ("Where a request for leave to file an amended complaint simply is imbedded within an opposition memorandum, the issue has not been raised properly.") (quotation marks omitted).

Because the time to amend as a matter of course has passed, Plaintiffs must receive Defendants' consent or the court's leave to amend. *See* Fed. R. Civ. P. 15(a). Under Federal Rule of Civil Procedure 15(a)(2), the court must "freely give leave [to amend] when justice so requires." Counseled plaintiffs should seek leave to amend in a motion, "set[ting] forth the substance of the proposed amendment or attach[ing] a copy of the proposed amendment." *Cita Tr. Co. AG v. Fifth Third Bank*, 879 F.3d 1151, 1157 (11th Cir. 2018); *see also* Doc. 45 at ¶ 1 (stating that a motion for leave to amend should contain as an exhibit the "complete and executed amended pleading"). The court cannot determine whether amendment is proper without seeing the substance of the proposed amendments.

## III.  CONCLUSION

The court **GRANTS IN PART** and **DENIES IN PART** Defendants' motions to dismiss.

The court **GRANTS** the motions as to Counts Three, Five, and Six. The court **DISMISSES** Counts Three and Six **WITHOUT PREJUDICE**, and the court **DISMISSES** Count Five **WITH PREJUDICE**.

The court **DENIES** the motions as to Count One and Plaintiffs' request for consequential, incidental, and punitive damages.

If Plaintiffs still wish to amend their fraud claim (Count Three) and their negligent, willful, and reckless misrepresentation claims (Count Six), **within 7 days** of entry of this order, Plaintiffs must file a motion to amend, attaching to the motion their proposed amended complaint.

**DONE** and **ORDERED** this April 8, 2019.

_____
**ANNEMARIE CARNEY AXON**
UNITED STATES DISTRICT JUDGE