FILED

2021 May-26  PM 04:53
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | | |
|---|---|---|
| **BREAKING FREE, LLC,** and **CONNIE BUTTRAM,** | } } } | |
| **Plaintiffs,** | } } } | |
| **v.** | } } | **Case No.: 4:18-cv-01659-ACA** |
| **JCG FOODS OF ALABAMA, LLC, KOCH MEAT CO., INC.,** and **KOCH FOODS, INC.,** | } } } } } | |
| **Defendants.** | } | |

## <u>MEMORANDUM OPINION</u>

Connie Buttram owns Breaking Free, LLC, a chicken growing farm. Ms. Buttram and Breaking Free are contract poultry growers for Defendants JCG Foods of Alabama, LLC; Koch Meat Co., Inc.; and Koch Foods, Inc. Defendants stopped placing chickens on the Breaking Free farm until Ms. Buttram agreed to meet with Defendants to discuss concerns that her husband's activities might threaten the livelihood of Defendants' chickens grown on the Breaking Free property. Ms. Buttram and Breaking Free then filed suit, alleging that Defendants prevented them from growing chickens in a fair and profitable manner. (Doc. 1).

The only claims remaining are that Defendants: (1) violated the Packers and Stockyards Act ("PSA"), 7 U.S.C. § 181, *et seq.* ("Count One"); (2) violated the

Agricultural Fair Practices Act ("AFPA"), 7 U.S.C. § 2301, *et seq.* ("Count Two"); (3) committed fraud ("Count Three"); and (4) breached the parties' contract ("Count Four").  (Doc. 54; *see also* Doc 46).

Currently before the court is Defendants' motion for summary judgment (doc. 78) and motion to exclude the opinion testimony of C. Robert Taylor, Ph.D.  (doc. 79).

First, the court **DENIES** Defendants' motion to exclude Dr. Taylor's opinion because even considering Dr. Taylor's testimony, Plaintiffs cannot survive summary judgment.

Second, the court **GRANTS** Defendants' motion for summary judgment on Plaintiffs' PSA and AFPA claims because Plaintiffs have presented no evidence creating triable issues of fact on these claims.   The court **WILL ENTER SUMMARY JUDGMENT** in favor of Defendants and against Plaintiffs on these two federal claims.

Because there is no independent basis for jurisdiction over Plaintiffs' state law claims for fraud and breach of contract, the court **DECLINES** to exercise supplemental jurisdiction over the claims and **WILL DISMISS** those claims without prejudice.  *See* 28 U.S.C. § 1367(c).

## I.   MOTION TO EXCLUDE EXPERT TESTIMONY

Plaintiffs retained C. Robert Taylor, Ph.D. as an expert to offer opinion testimony on three topics:  (1) Plaintiffs' economic performance as a contract grower for Defendants; (2) Plaintiffs' damages; and (3) whether Defendants' conduct is likely to harm competition.  (Doc. 78-17 at 88–89; *Id.* at 93 ¶ 6).  Defendants challenge the admissibility of Dr. Taylor's opinion testimony on the third topic—that their conduct is likely to harm competition.  (Doc. 81).

Under Rule 702, a qualified witness may offer expert opinion testimony if:  "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case."  Fed. R. Evid. 702.

"A trial court assessing the reliability of an expert's evidence" under Rule 702 must "perform a 'gatekeeping' function by conducting 'a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.'"  *Hendrix ex rel. G.P. v. Evenflo Co., Inc.*, 609 F.3d 1183, 1194 (11th Cir. 2010) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592–93

(1993)).  The performance of this function requires courts in this circuit to conduct

a "rigorous three-part inquiry" evaluating whether:

> (1) the expert is qualified to testify competently regarding the matters
> he intends to address; (2) the methodology by which the expert reaches
> his conclusions is sufficiently reliable as determined by the sort of
> inquiry mandated in *Daubert*; and (3) the testimony assists the trier of
> fact through the application of scientific, technical, or specialized
> expertise, to understand the evidence or to determine a fact in issue.

*Hendrix ex rel. G.P. v. Evenflo Co., Inc.*, 609 F.3d 1183, 1194 (11th Cir. 2010)

(quoting *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004)).

Defendants argue that Dr. Taylor's opinion that their conduct is likely to harm

competition is inadmissible because it fails the second prong of the *Daubert* test.

Specifically, Defendants contend that Dr. Taylor's opinion is not supported by a

reliable methodology because he did not conduct a scientific or technical analysis.

(Doc. 81 at 15–21).  Plaintiffs counter that Dr. Taylor's opinion is reliable based on

his specialized experience as an agricultural economist.  (Doc. 85 at 4–6).  The court

need not resolve this dispute because as explained in greater detail below, Plaintiffs

cite Dr. Taylor's opinion and testimony for only one proposition—that Defendants'

conduct in this case lowered grower pay.  *See infra* pp. 19–20.  Even accepting that

statement as true, Plaintiffs still cannot prevail on their claims.  *Id.*  Accordingly, the

court **DENIES** Defendants' motion to exclude Dr. Taylor's opinion.

## II.   MOTION FOR SUMMARY JUDGMENT

<u>1.</u>   <u>Background</u>

On a motion for summary judgment, the court "draw[s] all inferences and review[s] all evidence in the light most favorable to the non-moving party." *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1318 (11th Cir. 2012) (quotation marks omitted).

### A.   *The Parties and Their Operations*

JCG Foods is a commercial poultry processor located in Collinsville, Alabama.  (Doc. 781 at 18–20).  Koch Foods is the corporate parent of JCG Foods. (Doc. 78-9 at 8).  Koch Meat is another subsidiary of Koch Foods.  (Doc. 29).  Where necessary to distinguish among the Defendant entities, the court will refer to the Defendants separately.  Otherwise, for simplicity's sake, the court will refer to all three Defendants collectively.

Plaintiff Connie Buttram owns and operates Plaintiff Breaking Free LLC, a chicken growing farm.  (Doc. 78-1 at 6).  From 1997 until 2005, Ms. Buttram grew chickens for a different company.  (*Id.*).  Since 2005, Ms. Buttram and Breaking Free have grown chickens for a Koch Foods related entity.  (*Id.* at 12, 14, 90–95). Originally, Ms. Buttram and Breaking Free grew chickens for a Koch Foods facility located in Chattanooga, Tennessee.  (*Id.*).  In 2015, Ms. Buttram and Breaking Free contracted with JCG Foods to grow chickens for JCG Foods' Collinsville, Alabama

complex.  (Doc. 78-1 at 19, 203–227).  At all relevant times, Keith Rhodarmer was the complex manager at that facility (doc. 78-9 at 5–6), Jim Marsh was the live operations manager  (doc. 78-10 at 5), and Mike Hales was the broiler manager (doc. 78-12 at 5).

Under the parties' 2015 contract, JCG Foods agreed to deliver chickens along with feed, medication, other supplies, and technical advice and guidelines to Ms. Buttram and Breaking Free.  (Doc. 78-1 at 203–227; Doc. 78-2 at 1–17).  In exchange, Ms. Buttram and Breaking Free agreed to grow and care for the chickens consistent with the guidelines provided by JCG Foods.  (*Id.*).  In relevant part, the contract prohibited Breaking Free and any of its employees from owning, maintaining, or caring for "any other flocks, poultry or birds, including domestic poultry, fowl, turkey, ostrich, emu, rhea or guinea" on Breaking Free's farm or on any other premises.  (Doc. 78-1 at 208).  The agreement also required the parties to "execute and deliver all documents, provide all information and take or refrain from taking further action as may be necessary or appropriate to achieve the purposes of the" agreement.  (*Id.* at 218).

To fulfill her responsibilities under the contract, Ms. Buttram was in charge of general operations on the Breaking Free farm.  (Doc. 78-1 at 7).  This included checking on the chickens every two to three hours; removing dead or sick chickens; taking water readings; and monitoring feed and air quality in the chicken houses.

6

(*Id.*).   Although Mr. Buttram is not a Breaking Free employee, he managed the farm's controllers which were attached to the chicken houses, and he addressed equipment issues on the farm.   (Doc. 78-1 at 7–8, 22; Doc. 78-4 at 11–12, 45, 49). Mr. Buttram also helped check on the chickens and maintain the farm if Ms. Buttram was unavailable.   (Doc. 78-1 at 8; Doc. 78-4 at 11–12, 28).

In addition to their work on the Breaking Free farm, Ms. Buttram and Mr. Buttram are active in the Alabama Contract Poultry Growers Association ("ALCPGA").   (Doc. 78-1 at 32, 34; Doc. 78-4 at 15).   The Buttrams operate the ALCPGA out of their home.   (Doc. 78-4 at 74).   Mr. Buttram has served as president of the organization for the past 17 or 18 years.   (*Id.* at 15).   Ms. Buttram joined the ALCPGA in 2005, and she has served as secretary of the organization for a number of years.   (Doc. 78-1 at 32, 34).

The ALCPGA is an association that lobbies on behalf of poultry growers and also provides its members with the ability to purchase propane gas at a lower cost than if the member were to buy the propane directly from a company.   (Doc. 78-1 at 32; Doc. 78-4 at 19).   The ALCPGA also provides monetary assistance to its members and has helped establish 4-H programs to teach children how to operate chicken farms.   (Doc. 78-1 at 33).

The ALCPGA has three levels of membership: active members, inactive members, and associate members.   (Doc. 78-1 at 35–36).   Active members are

current contract poultry growers. (*Id.*). Inactive members are former contract poultry growers. (*Id.*). Associate members are individuals and businesses generally involved in the agricultural industry but who are not contract poultry growers. (Doc. 78-1 at 37). In her deposition, Ms. Buttram described associate members as "[a]nybody that is not a grower but is in the ag business and just wants to join so they can get th[e lower] propane price." (*Id.* at 37). For example, the ALCPGA has extended associate membership to an individual who operates a corn dryer and an individual who operates a cotton gin. (*Id.* at 37, 80).

### B.    *The Present Dispute*

Plaintiffs dispute with Defendants began in the aftermath of the December 2014 avian flu outbreak in the United States. The outbreak—the largest of its kind recorded in the United States—resulted in a $3.3 billion impact on the United States economy as well as the loss of 50 million commercial birds. (Doc. 78-13 at 2 ¶¶ 4, 7). To help stop the spread of avian flu, the United States Department of Agriculture and state authorities implemented farm quarantine, disposal, and additional biosecurity protocols. (*Id.* at ¶ 5; Doc. 78-13 at 25–45).

Relevant to this case, biosecurity refers to measures and practices used to keep diseases and pathogens away from flocks of chickens on poultry farms, including washing hands before and after coming into contact with live poultry; providing disposable foot covers and disinfectant footbaths; changing clothes before and after

entering a property; disinfecting tools and other equipment; and monitoring for and reporting signs of illness. (Doc. 78-13 at 7–9; Doc. 78-14 at 8). An additional biosecurity measure is limiting visitors at a farm because all farm visitors pose disease risk to poultry farms through infected fecal matter that sticks to shoes or clothing and that can be tracked into a different poultry house. (Doc. 78-13 at 3 ¶ 12; Doc. 84-1 at 36). Proper biosecurity measures reduce—but do not fully eliminate—the risk of a grower's flock becoming infected with avian flu and other diseases that threaten the commercial poultry industry. (Doc. 78-1 at 48; Doc. 78-4 at 47–48; Doc. 78-13 at 3 ¶ 13; *Id.* at 8, 16; Doc. 84-1 at 20).

In March or April 2016, a representative of filmmaker Morgan Spurlock visited Mr. Buttram on Mr. Buttram's father's farm, W.J. Buttram Farm. (Doc. 78-4 at 58). The representative told Mr. Buttram that Mr. Spurlock wanted "to do a documentary about restaurants" and asked Mr. Buttram if he would be interested in growing "a few chickens for a pop-up [restaurant]." (*Id.*). Mr. Buttram agreed, and in the summer of 2016, the W.J. Buttram Farm received a delivery of 2,600 chickens ("Spurlock chickens"). (*Id.*). Mr. Buttram put his son, Zack Buttram, in charge of regular care of the chickens because he did not want to go between the Breaking Free farm and the W.J. Buttram Farm and make the Spurlock chickens sick. (Doc. 78-4 at 58). Mr. Buttram testified the Spurlock chickens were called "free range" even though they remained inside the chicken houses. (*Id.* at 59). During the time

that his son raised the Spurlock chickens, Mr. Buttram was on the W.J. Buttram Farm for a couple of days while the documentary was being filmed.  (*Id.* at 59). After the chickens were grown, Zack Buttram drove the chickens to Ohio for the soft opening of a restaurant affiliated with the Spurlock documentary.  (Doc. 78-4 at 59).

In November 2016—approximately a year and a half after the last confirmed avian flu case in the United States and eleven months after the last commercial poultry farm was released from quarantine—Defendants learned about Mr. Buttram's involvement with the Spurlock chickens from a series of emails.  (Doc. 78-11 at 24–33; *see also* Doc. 78-13 at 2 ¶ 5; Doc. 78-13 at 46–47).  Those emails originated from the vice president of a national organization that works on behalf of the poultry industry.   (Doc. 78-11 at 24–33; *see also* doc. 78-10 at 26; doc. 84-3 at 7).  The emails explained that Mr. Spurlock had recently opened an Ohio restaurant as a "ploy for his movie," and that Mr. Buttram had "'partnered'" with Mr. Spurlock to "'raise [the Spurlock] chickens.'"  (Doc. 78-11 at 26, 28).  The emails contained pictures and video clips of the restaurant opening.  (*Id.* at 24; *see also* doc. 78-11 at 12–23; *id.* at 28–47).  Some of the pictures attached to the emails referred to the Spurlock chickens as "free-range" and "cage-free."  (Doc. 78-11 at 203–04).  One of the emails stated that Mr. Buttram "[a]pparently" is "trouble," and referenced Mr. Buttram's involvement with the ALCPGA.  (*Id.* at 78-11 at 27).

Mr. Rhodarmer, Mr. Marsh, and Mr. Hales discussed the emails and questioned whether there might be biosecurity concerns regarding Mr. Buttram's possible involvement with the Spurlock chickens and his work on the Breaking Free farm.  (Doc. 78-9 at 16; Doc. 78-10 at 39).  Mr. Marsh testified that he and Mr. Rhodarmer talked about the emails "as far as [Mr. Buttram's] involvement with growing chicken and the biosecurity aspect of it and that we were going to need to find out . . . what was going on it with it."  (Doc. 78-10 at 26).  Mr. Rhodarmer testified that he wanted to determine whether Mr. Buttram's involvement with the Spurlock chickens "was all a big joke or if it was real."  (Doc. 78-9 at 15).

Defendants decided to schedule a meeting with Ms. Buttram to discuss the issue.  (Doc. 78-9 at 14; Doc. 78-10 at 27–28).  Mr. Hales called Ms. Buttram and told her that Defendants wanted to know about Mr. Buttram's involvement with the Spurlock documentary and the Ohio restaurant, and he asked her to meet at JCG's Collinsville plant.  (Doc. 78-1 at 48; Doc. 78-9 at 14).  During this call, Ms. Buttram agreed to meet with Defendants.  (*Id.* at 66).

Ms. Buttram called Mr. Hales back and asked if JCG was taking Breaking Free off the chicken placement schedule until after the meeting.  (Doc. 78-1 at 49, 66; Doc. 78-12 at 65).  Mr. Hales told her that Breaking Free would receive its next regularly scheduled chicken deliveries.  (*Id.*).  Ms. Buttram ended the call by telling

11

Mr. Hales that she would call him back because she had a doctor's appointment and might need to cancel the meeting. (*Id.*).

Ms. Buttram and Mr. Hales had another telephone conversation during which Ms. Buttram told Mr. Hales that she needed to cancel their meeting. (Doc. 78-1 at 49; Doc. 78-12 at 63–64). Mr. Hales then told Ms. Buttram that she would not receive more chickens until the parties met. (Doc. 78-12 at 64; *see also* Doc. 78-10 at 37). JCG removed Breaking Free from the placement schedule, and Defendants did not hear directly from Ms. Buttram again. (Doc. 78-9 at 14).

Ms. Buttram testified that she did not reschedule her meeting with Defendants because she felt like they were "punishing her" for something she did not do. (Doc. 78-1 at 68). Instead, Ms. Buttram hired a lawyer who sent Defendants a letter in early February 2017. (Doc. 78-2 at 114–15; *see id.* at 117). The letter accused Defendants of engaging in unlawful conduct by insisting that Ms. Buttram meet with them before delivering additional chickens to the Breaking Free farm. (Doc. 78-2 at 114–15).

A few weeks later, Defendants' counsel sent Ms. Buttram's attorney a letter explaining that Defendants had requested the meeting with Ms. Buttram to discuss issues under the parties' contract "relating to significant biosecurity concerns that arose relating to poultry growing activities in which [Defendants] learned [Mr.] Buttram was engaged." (Doc. 78-2 at 117). Specifically, the letter stated that

Defendants learned that Mr. Buttram "was engaged in growing free-range poultry while also assisting with the operations of Ms. Buttram's farm. . . ." (*Id.*). The letter concluded by explaining that once Defendants understood the extent of Mr. Buttram's involvement with growing other chickens and his current role with operation of the Breaking Free farm, then Defendants and Ms. Buttram could determine how to move forward "with the goal of resuming flock placements at the farm" in a prompt manner. (*Id.* at 118).

Over the following months, counsel for Ms. Buttram and counsel for Defendants emailed one another. At Ms. Buttram's request, Defendants provided her with a list of specific biosecurity concerns. (Doc. 78-2 at 120–21). Ms. Buttram's response did not specifically address any of the questions Defendants asked but instead referred to an unrelated issue that took place in 2014 on W.J. Buttram Farm and generally denied that Breaking Free had any biosecurity issues. (*Id.* at 120). Based on Ms. Buttram's response, counsel for Defendants explained that they would be willing to resume chicken placements on the Breaking Free farm if Ms. Buttram would provide written assurance that: (1) neither she nor anyone else involved with the operation of her farm (including Mr. Buttram or others) currently owned, maintained, or cared for any other flocks of poultry or birds; and (2) neither she nor anyone else involved with the operation of her farm (including Mr. Buttram or others) would own, maintain, or care for any other flocks of poultry or birds during

the term of her agreement with JCG Foods. (*Id.* at 119).  Ms. Buttram testified that she refused to sign any written assurance because she believed that Defendants would not admit they were wrong for stopping chicken placements in the first place. (Doc. 78-1 at 71, 78).

This lawsuit followed.

2.    Discussion

In deciding a motion for summary judgment, the court must determine whether, accepting the evidence in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *see also Hamilton*, 680 F.3d at 1318.  "[T]here is a genuine issue of material fact if the nonmoving party has produced evidence such that a reasonable factfinder could return a verdict in its favor."  *Looney v. Moore*, 886 F.3d 1058, 1062 (11th Cir. 2018) (quotation marks omitted).

Defendants move for summary judgment on all of Plaintiffs' remaining claims.  As explained below, because Plaintiffs have not presented evidence creating triable issues of fact on their PSA and AFPA claims, the court will enter judgment as a matter of law in favor of Defendants on those claims.  The court will not address the merits of Plaintiffs' state law fraud and breach of contract claims because the court declines to exercise supplemental jurisdiction over those claims.

14

A.    *Count One (PSA)*

In Count One of their amended complaint, Plaintiffs allege Defendants stopped placing chickens on their farm and terminated the parties' contract because of the Buttrams' membership in the ALCPGA and because of Mr. Buttram's involvement with the Spurlock documentary and restaurant in violation of the PSA. (Doc. 54 at ¶¶ 55–61).

Congress enacted the PSA in 1921 "to comprehensively regulate packers, stockyards, marketing agents and dealers." *London v. Fieldale Farms Corp.*, 410 F.3d 1295, 1301 (11th Cir. 2005) (quotation marks omitted).  When the law was passed, "[t]he chief evil feared [wa]s the monopoly of the packers, enabling them unduly and arbitrarily to lower prices to the shipper, who sells, and unduly and arbitrarily to increase the price to the consumer, who buys." *Stafford v. Wallace*, 258 U.S. 495, 514–15 (1922).  Congress later amended the PSA to include live poultry dealers and handlers and swine contractors.  *London*, 410 F.3d at 1302.

Here, Plaintiffs claim that Defendants' conduct violates sections 202(a) and (b) of the PSA which make it unlawful for live poultry dealers to "[e]ngage in or use any unfair, unjustly discriminatory, or deceptive practice or device" or "subject any particular person or locality to any undue or unreasonable prejudice or disadvantage in any respect."  Packers and Stockyards Act § 202(a), (b), 7 U.S.C. § 192(a), (b).

Plaintiffs argue that their PSA claim survives summary judgment for two reasons: (1) the evidence shows that Defendants actions have injured or are likely to injure competition, and (2) even in the absence of evidence establishing harm to competition, they can establish their PSA claim through evidence of predatory intent.  (Doc. 86 at 30–36).  Plaintiffs' second argument is foreclosed by *Pickett v. Tyson Fresh Meats, Inc.*, 420 F.3d 1272 (11th Cir. 2005), a case in which the Eleventh Circuit explained that "[t]he *London* decision settles in this circuit that by 'unfair' practice, PSA § 202(a) means a practice that does or is likely to affect competition."  *Id.* at 1280; *see also London*, 410 F.3d at 1304 ("Eliminating the competitive impact requirement would ignore the long-time antitrust policies which formed the backbone of the PSA's creation.").  Accordingly, the court addresses only whether Plaintiffs have presented sufficient evidence from which a reasonable jury could infer competitive harm.  And as explained below, Plaintiffs have not sustained their burden.

The Eleventh Circuit has held that in order to prevail on a claim under section 202(a) of the PSA, a plaintiff must show that a defendant's conduct "affects competition or is likely to adversely affect competition."  *London*, 410 F.3d at 1304.  Although the Eleventh Circuit has not addressed whether evidence of an adverse effect on competition is required for purposes of section 202(b), the parties assume

that *London's* holding applies equally to claims under section 202(b) of the PSA. (*See* Doc. 80 at 23; Doc. 86 at 31).  Therefore, the court does as well.

Evidence that may support a finding of adverse effects on competition or likely adverse effects on competition includes information about the total number of chicken buyers and growers in the relevant market area; the percentage of the market the chicken buyer controls; and the parties' relative stature within the chicken industry.  *London*, 410 F.3d at 1305.  In addition, to establish an adverse or likely adverse effect on competition—and ultimately, to prevail on a PSA claim—a plaintiff must show that the defendant's actions "have no pro-competitive justifications."  *Pickett*, 420 F.3d at 1279.

Plaintiffs argue that they have presented the following evidence that creates triable issues of fact about whether Defendants' conduct injured or is likely to injure competition: (1) Defendants operate as a monopsonist;[1] (2) Defendants have used their monopsonistic power to reduce the prices paid to both growers generally and Plaintiffs specifically; and (3) Defendants had no pro-competitive justification for their decision to stop placing chickens on the Breaking Free farm.  (Doc. 86 at 32–34).  Plaintiffs' arguments are not persuasive.

---

[1] Plaintiffs refer to Defendants as a "monopsony."  A "monopsony" is a market condition. *Monopsony*, Black's Law Dictionary (10th ed. 2014).   Based on the context in which the word appears, the court assumes Plaintiffs contend that Defendants are a monopsonist, or a single buyer who controls the market.  (*Id.*).

First, Plaintiffs argue that they have shown competitive injury because Defendants operate as a monopsonist in the relevant market area. (Doc. 86 at 32). Even assuming this is true, evidence that an entity is a monopsonist, without more, is insufficient to demonstrate injury to competition. The case that Plaintiffs rely on in support of their argument, *Been v. O.K. Indus., Inc.*, 495 F.3d 1217, 1231 (10th Cir. 2007), illustrates the point. In *Been,* the Tenth Circuit reversed a district court's decision to grant summary judgment in favor of a poultry producer on PSA claims because the plaintiffs had produced evidence of a competitive injury. *Been*, 495 F.3d at 1230–35. In doing so, the Tenth Circuit noted that the record contained evidence that supported the plaintiffs' contention that the poultry producer was a monopsonist but made clear that a buyer's status as a monopsonist alone is insufficient to establish a PSA claim. *Id.* at 1234.

The Tenth Circuit acknowledged that a monopsonist "*can* threaten competition" *id.* at 1232 (emphasis added), if the monopsonist's activity results in "arbitrarily decreas[ed] prices paid to sellers with the likely effect of increas[ed] resale prices," *id.* at 1233. But to show injury to competition, a buyer's status as a monopsonist alone is insufficient; rather the monopsonist must "engage in specific practices that result in or are likely to result in the anticompetitive effects that the PSA was designed to prevent." *Been*, 495 F. 3d at 1234. Thus, even if Defendants

here operate as a monopsonist, this evidence, without more, does not show injury to competition.

Second, Plaintiffs contend that Defendants exercised their monopsonist power to decrease prices paid to growers.  (Doc. 86 at 33).  In support of this position, Plaintiffs cite to nine different statements contained in sections of their brief dedicated to their additional statements of undisputed and disputed facts.  (*Id.*). Eight of these statements have no bearing on how Defendants' conduct might have decreased prices paid to other chicken growers.  (*See* Doc. 86 at 24 ¶¶ 57–58; *Id.* at 29 ¶¶ 9–12, 14–15).

The only statement that appears to support Plaintiffs' contention is paragraph 13 in their "statement of additional disputed facts" that their expert, Dr. Taylor, "concluded that Defendants' alleged conduct posed a 'likely harm' to competition as set out in his report."  (Doc. 86 at 29 ¶ 13).  In support of this statement of fact, Plaintiffs cite page 17 of Dr. Taylor's report which states that "grower fear of retaliation by integrators permeates the poultry industry," and that Defendants' actions "in not placing birds with Breaking Free, an above average grower, stokes these fears, thereby likely causing competitive harm throughout the industry."  (Doc. 78-17 at 108; *see also* doc. 86 at 29 ¶ 13).  Plaintiffs also cite Dr. Taylor's opinion that Defendants' conduct is likely to harm competition "as [] laid out in [his] report." (Doc. 78-17 at 12).  In his deposition, when explaining the basis of his opinion,

Dr. Taylor testified that he based his conclusion on "general knowledge of the industry" and "the fact of fear in the industry and markets not going to be competitive if fear dominates." (*Id.* at 12–13).

Neither the cited portion of Dr. Taylor's report nor the cited portions of his deposition testimony states that Defendants' conduct decreased grower pay. And in fact, elsewhere in Dr. Taylor's deposition, when asked whether he had undertaken an analysis to determine whether Defendants' actions in this case have resulted in lower grower compensation, Dr. Taylor answered, "No, I have not." (Doc. 78-17 at 14). Therefore, Plaintiffs have offered no admissible evidence demonstrating that Defendants' decision to stop placing chickens on their farm has decreased grower pay. But even if they had presented evidence to that effect, Plaintiffs could not establish injury to competition because, as explained below, Plaintiffs cannot show that Defendants' actions had no pro-competitive justification. *See infra* pp. 20–22.

Next, Plaintiffs argue that triable issues of fact exist regarding likely injury to competition because Defendants' failure to place chickens on their farm "indefinitely reduced [to zero] the price" Defendants paid to Plaintiffs. (Doc. 86 at 33). This argument asks too much. Plaintiffs do not cite, and the court has not located, any authority standing for the proposition that evidence of a plaintiff's individual damages can show likely competitive harm to an industry at large. And given "the long-time anti-trust policies which formed the backbone of the PSA's

creation," *London*, 410 F.3d at 1304, it makes sense that evidence of Plaintiffs'
individual harm is just that and nothing more.  *See id.* ("Failure to require a
competitive impact showing would subject dealers to liability under the PSA for
simple breach of contract. . . ."); *Terry v. Tyson Farms, Inc.*, 604 F.3d 272, 279 (6th
Cir. 2010) (finding that district court did not err in dismissing a PSA claim where
plaintiff alleged facts showing only how defendant's action harmed the plaintiff as
an individual grower).  Accordingly, that Plaintiffs themselves might have suffered
some harm from Defendants' conduct does not create triable issues of fact that
Defendants' activities have caused or are likely to cause harm to competition within
the chicken growing industry.

Third, Plaintiffs contend that the evidence creates triable issues of fact
regarding whether Defendants' actions have no pro-competitive justification.  (Doc.
86 at 33–34).  Defendants' proffered competitive justification for suspending
chicken placements on the Breaking Free farm is that they had an "interest in keeping
their birds alive" on the Breaking Free farm.  (Doc. 80 at 27).  Mr. Rhodarmer,
Mr. Marsh, and Mr. Hales all testified that if Mr. Buttram was growing chickens on
another farm, his activities could pose biosecurity risks to Defendants' chickens on
the Breaking Free farm and that Defendants would not deliver more chickens to
Ms. Buttram until she met with them to discuss her husband's activities.  (Doc. 78-
9 at 14, 16; Doc. 78-10 at 27, 36, 39; Doc. 78-12 at 24).

Plaintiffs argue that a reasonable jury could conclude that Defendants' biosecurity justification "was fabricated and pretextual" for two reasons. (Doc. 86 at 33). First, Plaintiffs claim that Defendants' justification is false because when Mr. Hales contacted Ms. Buttram immediately after learning about Mr. Buttram's possible involvement with the Spurlock chickens, neither Mr. Hales nor anyone else associated with Defendants communicated any concerns about biosecurity issues; instead, Defendants mentioned only Mr. Buttram's involvement with the Spurlock restaurant and documentary. (Doc. 78-1 at 48–49; *see also* Doc. 78-9 at 14; Doc. 78-12 at 26). The record supports Ms. Buttram's position that Defendants did not mention a potential biosecurity risk when they first contacted her to schedule a meeting in November 2016. (*See id.*). The first time Ms. Buttram learned that Defendants stopped placing chickens on her farm because of a potential biosecurity threat was in a letter from Defendants' attorney to her attorney in February 2017. (Doc. 78-1 at 70, 72; Doc. 78-2 at 116–18). However, that Ms. Buttram did not know for several months that biosecurity motivated Defendants' decision not to place chickens on her farm until the parties met does not create a question of fact about whether that reason is real. It just means that Ms. Buttram was not aware of the reason for some time.

Second, Plaintiffs contend that Defendants' pro-competitive justification is false because Defendants did not utilize their procedures (like sending a service

technician to her farm, issuing a deficiency notice, or putting Ms. Buttram on a performance improvement plan) to obtain information from Ms. Buttram.  (Doc.  86 at 33–34).  Even if Defendants did not follow their general procedures for gathering information from growers about biosecurity issues, this evidence is insufficient for a reasonable jury to conclude that the potential biosecurity concerns were not the real reason that Defendants stopped placing chickens on the Breaking Free farm because the evidence does not factually contradict the existence of Defendants' bio-security concern or that that concern is a pro-competitive justification for its actions.

Because Plaintiffs have not presented sufficient evidence from which a reasonable jury could infer that Defendants' decision to stop placing chickens on Plaintiffs' farm adversely affected or is likely to adversely impact competition, their PSA claim fails as a matter of law.  Therefore, the court **WILL ENTER SUMMARY JUDGMENT** in favor of Defendants on Plaintiffs' PSA claim.

### B.      *Count Two (AFPA)*

In Count Two of their amended complaint, Plaintiffs allege that Defendants refused to place chickens on their farm because of the Buttrams' membership in the ALCPGA in violation of the AFPA.   (Doc. 54 at ¶¶ 62–67).  Under the AFPA, it is unlawful for "handlers" to refuse to deal with or discriminate against "producers" because of membership in "an association of producers" or to coerce or intimidate

"producers" to terminate membership in "an association of producers."  7 U.S.C. § 2303(a)-(c).

It is undisputed that Defendants are "handlers" and that Ms. Buttram and Breaking Free are "producers" within the meaning of the AFPA.  The issue before the court is whether the ALCPGA is  "an association of producers" under the AFPA. If it is not, then summary judgment is due to be entered in favor of Defendants because Plaintiffs are not entitled to protection under the statute.  (*See* Doc. 80 at 28).  Alternatively, Defendants argue that Plaintiffs have not produced evidence creating triable issues of fact regarding whether Defendants' actions have any relation to the ALCGPA.  (*Id.*).  Because Defendants' first argument is dispositive, the court does not consider Defendants' alternative argument.

The AFPA defines "association of producers" as "any association of producers of agricultural products engaged in marketing, bargaining, shipping, or processing as defined in section 1141j(a) of Title 12, or in section 291 of this title." 7 U.S.C. § 2302(2)(A).  The AFPA also defines an "association of producers" as "an organization whose membership is exclusively limited to agricultural producers and dedicated to promoting the common interest and general welfare of producers of agricultural products."  *Id.* at § 2302(2)(B).

The undisputed evidence establishes that the ALCPGA does not meet the first definition of "association of producers."   As noted above, to qualify as an

24

"association of producers" under section 2302(2)(A), the organization must engage in "marketing, bargaining, shipping, or processing as defined in section 1141j(a) of Title 12 [the Agricultural Marketing Act], or in section 291 of this title [the Capper-Volstead Act]." 7 U.S.C. § 2302(2)(A). The relevant section of the Agricultural Marketing Act provides that the association must be one "in which farmers act together in processing, preparing for market, handling, and/or marketing the farm products of persons so engaged" or one "in which farmers act together in purchasing, testing, grading, processing, distributing, and/or furnishing farm supplies and/or farm business services." 12 U.S.C. § 1141j(a). Similarly, the relevant section of the Capper-Volstead Act states that "[p]ersons engaged in the production of agricultural products as farmers, planters, ranchmen, dairymen, nut or fruit growers may act together in associations . . . in collectively processing, preparing for market, handling, and marketing in interstate and foreign commerce, such products of persons so engaged." 7 U.S.C. § 291.

The ALCPGA is an organization that lobbies on behalf of growers, works with local 4-H programs to help students learn about chicken farming, and gives financial assistance to its members. (Doc. 78-1 at 32–33). None of these activities fall within those contemplated by the statutory definition of "association of producers," and indeed Plaintiffs make no such argument.

The ALCPGA also provides its members with the ability to buy propane at a lower cost than if the members were to buy the propane from a commercial seller. (*Id.*; Doc. 78-4 at 19).  Plaintiffs claim because the ALCPGA "engages in bargaining, i.e., negotiating the terms of its propane gas agreement on behalf of its members," the ALCPGA is an "association of producers" under § 2302(2)(A).  (Doc. 86 at 36). But Plaintiffs have presented no evidence demonstrating how that specific bargaining or negotiating falls within the cross-referenced definitions from the Agricultural Marketing Act and the Capper-Volstead Act.  Negotiating propane prices is not evidence that the ALCPGA's members collectively process, prepare for market, handle, or market their chicken.  *See* 7 U.S.C. § 291; 12 U.S.C. § 1141j(a). Neither is negotiating propane prices evidence that the ALCPGA's members acted together to test, grade, process, distribute, or furnish farm supplies or farm business services.  *See* 12 U.S.C. § 1141j(a).

The only possible way in which bargaining or negotiating propane prices satisfies the AFPA's definition of "association of producers" is if this activity constitutes "purchasing . . . farm supplies."  *See id.*  But Plaintiffs have not provided any evidence demonstrating that the ALCGPA's members acted together to purchase propane as a farm supply.  The evidence is that the organization has secured propane for its members at a lower cost than if they were to buy the propane elsewhere.  (Doc. 78-1 at 32–33; Doc. 78-4 at 19).  Plaintiffs have offered no evidence that the propane

26

agreement is the result of collective action.  Moreover, Plaintiffs have offered no evidence that any ALCGPA member used the propane as a supply in connection with chicken farming.  Therefore, Plaintiffs have not shown that the ALCGPA is an "association of producers" under § 2302(2)(A).

The court's conclusion is consistent with how the Supreme Court has described the nature and purpose of the AFPA.  In *Michigan Canners & Freezers Assoc., Inc. v. Agric. Mktg. & Bargaining Bd.*, 467 U.S. 461 (1984), the Supreme Court explained that the AFPA "protects the right of farmers and other producers of agricultural commodities to join cooperative associations through which to market their products."  *Id.* at 464.  According to the Supreme Court, the AFPA makes it unlawful for a processor "to engage in practices that interfere with a producer's freedom to choose whether to bring his products to market himself or to sell them through a producers' cooperative association."  *Id.*

Plaintiffs have offered no evidence showing that the ALCPGA is engaged in the marketing, bargaining, shipping, or processing of chicken in a manner designed to bring its members' product to market.  That the ALCPGA happens to bargain on behalf of its members by negotiating favorable propane gas prices is not evidence that the organization assists its members in selling chickens through the ALCPGA, particularly where, as here, Plaintiffs have not produced any evidence that the propane is even used on chicken farms.  Accordingly, the court finds that the

27

ALCPGA does not meet the first definition of "association of producers" under the statute.

Plaintiffs' brief does not address whether or how the ALCPGA meets the second definition of an "association of producers."  (*See generally* doc. 86 at 36–37).  But the undisputed evidence shows that the ALCPGA does not meet the second definition of "association of producers" because its membership is not exclusively limited to agricultural producers.  The ALCPGA allows "associate membership" to anyone who is not a contract grower but who is active in the agricultural industry generally.  (Doc. 78-1 at 27, 80; Doc. 78-4 at 24).  Ms. Buttram's undisputed testimony is that "[a]nybody that is not a grower but is in the ag business that uses propane and just wants to join so they can get [the negotiated] propane price" can join the ALCPGA.  (Doc. 78-1 at 37).  For instance, the ALCPGA has extended membership to an individual who operates a cotton gin.  (Doc. 78-1 at 37, 80).  But the AFPA explicitly excludes cotton from the definition of agricultural products. 7 U.S.C. § 2302(1) ("The term 'agricultural products' shall not include cotton . . . or [its] products.").  Therefore, inclusion of a cotton gin operator as a member of the ALCPGA demonstrates that the organization is not limited to agricultural producers.

Because Plaintiffs have not created triable issues of fact about whether the ALCPGA is an "association of producers" as the term is defined in the AFPA, their

AFPA claim fails as a matter of law.  Therefore, the court **WILL ENTER SUMMARY JUDGMENT** in favor of Defendants on Plaintiffs' AFPA claim.

### C.    Count Three (Fraud) and Count Four (Breach of Contract)

In Count Three of their amended complaint, Plaintiffs assert a fraud claim. (Doc. 54 at ¶¶ 68–79).  In Count Four of their amended complaint, Plaintiffs assert a breach of contract claim.  (*Id.* at ¶¶ 80–83).  Both of these claims arise under state law, and the amended complaint alleges that the court has pendent jurisdiction over these claims.  (*Id.* at ¶ 5).

The court "may decline to exercise supplemental jurisdiction" over a state law claim when the court "has dismissed all claims over which it has original jurisdiction."  28 U.S.C. § 1367(c).  "The decision to exercise supplemental jurisdiction over pendent state claims rests within the discretion of the district court." *Raney v. Allstate Ins. Co.*, 370 F.3d 1086, 1088–89 (11th Cir. 2004).  And the Eleventh Circuit encourages district courts to dismiss remaining state law claims where all federal claims are dismissed before trial.  *Id.* at 1089.

Plaintiffs have not shown that the court has original jurisdiction over their state law claims, and as explained above, the court will enter judgment in Defendants' favor on all federal claims in this action.  Therefore, in its discretion, pursuant to 28 U.S.C. § 1367(c), the court **WILL DISMISS** without prejudice Plaintiffs' fraud and breach of contract claims.

### III.   CONCLUSION

For the reasons explained above, the court **DENIES** Defendants' motion to exclude the opinion testimony of Dr. Taylor and **GRANTS** Defendants' motion for summary judgment as to Plaintiffs' PSA and AFPA claims.   The court **WILL ENTER SUMMARY JUDGMENT** in favor of Defendants and against Plaintiffs on their PSA and AFPA claims.

In addition, the court **DECLINES** to exercise supplemental jurisdiction over Plaintiffs' state law fraud and breach of contract claims and **WILL DISMISS** those claims without prejudice.

The court will enter a separate order consistent with this memorandum opinion.

**DONE** and **ORDERED** this May 26, 2021.

_____
**ANNEMARIE CARNEY AXON**
UNITED STATES DISTRICT JUDGE